**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

FILED
RICHARD W. NAGEL
CLERK OF COURT

APR - 7 2025 10: 28  A

U.S. DISTRICT COURT
SOUTHERN DISTRICT
OF OHIO-COLUMBUS

| | |
|---|---|
| HELAL DAOUD, | : |
| 790 Brooks Way | : |
| Columbus, Ohio, 43212, | : |
| | : |
| Plaintiff, | : |
| | : |
| v. | : |
| | : |
| CITY OF COLUMBUS, | : |
| Division of Police, | : |
| c/o Andrew Ginther, Mayor, | : |
| 90 West Broad Street, | : |
| Columbus, Ohio 43215, | : |
| | : |
| Defendant. | : |

CIVIL ACTION NO.

2:25 CV 0360

JUDGE        JUDGE WATSON

MAGISTRATE JUDGE

MAGISTRATE JUDGE DEAVERS

**JURY DEMAND ENDORSED**
**HEREON**

**COMPLAINT**

I. **Preliminary Statement**

1.    This action seeks economic, compensatory, and punitive damages; declaratory, injunctive, and equitable relief; prejudgment and post-judgment interest; and attorneys' fees and costs for the violations of the Reconstruction Era Civil Rights Act, 42 U.S.C. § 1981, and the Ohio Laws Against Discrimination, R.C. 4112, committed by Defendant when it discriminated against Plaintiff based on his race (Middle Eastern) by filing disciplinary charges against him and, ultimately, terminating his employment as a Columbus Division of Police Patrol Officer while retaining similarly situated white and/or non-Middle Eastern co-workers and/or treating them more favorably than him for the same, similar, and/or worse conduct.

1

## II.  Jurisdiction and Venue

2.    Plaintiff brings race discrimination claims under the Reconstruction Era Civil Rights Act, 42 U.S.C. § 1981, and the Ohio Laws Against Discrimination, R.C. 4112.99.

3.    This Court has jurisdiction by virtue of 28 U.S.C. §§ 1331 (federal question); 1343 (civil rights); and 1367 (supplemental jurisdiction).

4.    Declaratory, injunctive, and equitable relief, including reinstatement, are sought pursuant to 28 U.S.C. §§ 2201; 2202; 42 U.S.C. § 1981; R.C. 4112.99(A); and the common law of the State of Ohio.

5.    Compensatory and punitive damages may be awarded under 42 U.S.C. § 1981; R.C. 4112.99; and the common law of the State of Ohio.

6.    Costs and attorneys' fees may be awarded pursuant to the 42 U.S.C. § 1988; Fed. R. Civ. P. 54; and the common law of the State of Ohio.

7.    Venue in this Court is proper pursuant to 28 U.S.C. § 1391(b) and S.D. Civ. R. 82.1 because the claims arose in and around Franklin County, Ohio, where Defendant City of Columbus locates its Division of Police Headquarters, conducts its operations, and employed Plaintiff at all times material to this Complaint.

## III.  Parties

8.    Plaintiff Helal Daoud is a male, Middle Eastern resident of Franklin County, Ohio; was employed by Defendant in a bargaining-unit, W-2 position as a Patrol Officer for approximately six and a half years; where he earned an annual base salary of $99,647.26 per year and generous opportunities for overtime and special duty pay in addition to public employee benefits.

9.      Defendant City of Columbus is a political subdivision of the State of Ohio pursuant to Chapter 2744 of the Ohio Revised Code; is an employer within the meaning of R.C. § 4112.01 and 42 U.S.C. § 1981; employs at its Division of Police, on a daily basis each week, more than 20 employees; and, at all times material to this Complaint, acted under color of state law; employed Plaintiff as a Columbus Division of Police ("CDP") Patrol Officer in a W2 capacity; and subjected him to race discrimination by terminating his employment for alleged misconduct while retaining non-protected similarly situated employees who engaged in the same, similar, and/or worse conduct than him.

## IV.     Facts

10.     Plaintiff, Helal Daoud ("Plaintiff"), is an individual of Middle Eastern descent and was formerly employed by Defendant as a Patrol Officer from June 20, 2016 until his termination, effective December 8, 2022.

11.     In his role as a Patrol Officer, Plaintiff was a union member; thus, his employment was subject to the terms of the Collective Bargaining Agreement between Defendant and the Fraternal Order of Police Capital City Lodge No. 9 ("FOP").

12.     Plaintiff is a racial minority among Defendant's employees and, therefore, is a member of a protected class.

13.     Prior to joining Defendant's police force, Plaintiff was trained as a recruit at the Columbus Police Academy from June 20, 2016 to January 6, 2017, where he excelled in his courses and received favorable reviews from his commanders and received consistent high grades in his OPOTA/training course studies.

14. Plaintiff performed his duties as a Patrol Officer competently, receiving several citizen compliments, as well as CDP's First Aid / Lifesaving Award and its Physical Fitness Award.

15. On December 15, 2021, at approximately 3:47 p.m., Plaintiff received a dispatch call to a house located at 1890 South 4th Street (Incident/CAD #: 210946311).

16. The City's 911 dispatcher informed Plaintiff that a caller reported that the house was a "vacant property."

17. The caller further reported that a "Black male" wearing a "black coat" or "black hoodie" was allegedly "ripping the aluminum siding off the house" and "scrapping all the metal," effectively "stripping the house."

18. Plaintiff arrived on the scene around 3:59 p.m., where he observed that many of the house's windows were broken and that it appeared to be vacant, consistent with the information relayed by the dispatcher.

19. Plaintiff observed a man standing outside the house who did not match the description provided in the dispatch call. The man informed Plaintiff that he was from Mansfield, Ohio, did not live at the residence, and had not witnessed anyone stealing property.

20. Plaintiff drove around the house to search for the suspect described by dispatch, but no one matching the description was in the immediate vicinity.

21. Upon driving back to the front of the house in his assigned Police cruiser, Plaintiff saw the front door of the house, which Plaintiff reasonably believed to be a vacant property, slam shut.

22.     At this point, Plaintiff exited his Police cruiser and stepped onto the porch/patio area, radioed for assistance/backup over his issued Police radio, and heard movement or footsteps coming from inside the house.

23.     While on scene around this time, Plaintiff also heard a bystander across the street shout, "They're in there!"

24.     Believing, in good faith, that a trespassing suspect was inside the vacant home, violating Ohio Revised Code 2911.13 Breaking and Entering (a Felony of the 5th degree) and/or Ohio Revised Code 2911.21 Trespassing (a Misdemeanor of the 4th degree), Plaintiff called for backup and drew his service weapon.

25.     Finding the door locked and reasonably believing a trespasser was inside, Plaintiff kicked the door open.

26.     Inside, Plaintiff observed an individual sitting on a couch who did not match the suspect description provided by dispatch.

27.     Plaintiff also observed four additional individuals inside the house.

28.     At the conclusion of this call for service, Plaintiff did not arrest any individuals and/or complete arrest paperwork and/or take any case reports and/or document and/or attempt to document and/or take any police action and/or other police reports and/or any legal actions, written or otherwise relating to this incident, including any uses and/or attempted uses of force against civilians, and/or was not on the receiving end of any civilian complaints and/or attempted civilian complaints regarding Plaintiffs actions, that would require Plaintiff to testify and/or answer for in a court of competent jurisdiction and/or law, and/or that would motivate and/or influence and/or cause Plaintiff to perjure himself while testifying in a court of competent jurisdiction and/or law, and/or otherwise have required

Plaintiff to answer for his actions in this call for service in a court of competent jurisdiction and/or law, in any future and/or potential future proceeding(s), that resulted in the termination of the Plaintiff by the Defendant.

29.     Following this incident, CDP Sergeant Jeremy Goldstein interviewed Plaintiff about this incident, due to Plaintiff's forced entry into the home.

30.     Plaintiff responded truthfully to Sgt. Goldstein's questions.

31.     Unbeknownst to Plaintiff at the time, Sgt. Goldstein later provided an investigative report to Lieutenant Gregory Sanderson about the incident.

32.     Sgt. Goldstein's report to Lt. Sanderson largely corroborated Plaintiff's account of events.

33.     Nevertheless, on January 25, 2022, Defendant initiated an Internal Affairs Bureau ("IAB") investigation into Plaintiff's conduct related to the December 15, 2021 incident.

34.     Lt. Sanderson interviewed Plaintiff about the events on January 27, 2022, over a month and a half after it occurred.

35.     Prior to this interview, Plaintiff did not review any reports from the incident (that did not exist – see paragraph 28) or his body camera footage and, thus, had a less-than-ideal recollection of the order of the events that day.

36.     Plaintiff, in good faith, honestly answered Lt. Sanderson's questions about the December 15, 2021 incident to the best of his memory as it existed on January 27, 2022.

37.     However, following this investigation, Lt. Sanderson ultimately recommended that Defendant issue two disciplinary charges against Plaintiff: one for the warrantless forced entry ("Charge I") and another for allegedly "being untruthful" about

(a) hearing a bystander yell that someone went inside the house and (b) that he had "no prior knowledge of any information concerning the address" he reported to on December 15, 2021 ("Charge II").

38. Lt. Sanderson convinced himself that Plaintiff must have known in advance that the house was not abandoned, given that CDP's INTAC team raided the same address earlier that same day, as reportedly discussed at roll call that morning (before Plaintiff responded to the dispatch call).

39. Lt. Sanderson's assumption that Plaintiff heard and specifically recalled the house number and street mentioned off-hand in roll call as part of an unrelated raid – entirely separate and apart from Plaintiff's regular assignment – in his response to the dispatch call is not reasonable.

40. Yet, even though Plaintiff's good faith belief – based on the information provided to him by the 911 dispatcher and the condition of the home's exterior – that the house was abandoned was reasonable and honestly held, Lt. Sanderson somehow concluded that Plaintiff had been untruthful in stating that he did not recall hearing about the address or the raid during roll call conducted at the beginning of Plaintiff's shift.

41. Furthermore, Plaintiff's immediate supervisor Sgt. Jeremy Goldstein, who was present at roll call with Plaintiff on December 15, 2021, stated in his interview with Lt. Sanderson that he did not recall anything specifically regarding the house/INTAC raid in question from roll call at the beginning of the shift, a fact which was completely and/or intentionally disregarded by Lt. Sanderson and/or Defendant in concluding that Plaintiff had been untruthful.

42. Officer Michael Kowaleski, who was present at roll call with Plaintiff on December 15, 2021, arrived on scene after Plaintiff called for backup, and stated audibly on body camera footage that he agreed with the Plaintiff that the house appeared to be a vacant structure while having a discussion with the Plaintiff on scene, a fact which was completely and/or intentionally disregarded by Lt. Sanderson and/or Defendant in concluding that Plaintiff had been untruthful.

43. In addition, after the backup officer(s) arrived, Plaintiff utilized his cellphone and called his direct supervisor, Sgt. Goldstein, explicitly informing him and/or self-notifying him that Plaintiff had kicked in and/or forced entry into the structure relevant to and/or explicitly mentioned in the call for service (the conversation to which is audibly heard on body camera footage) and subsequently took and sent pictures of the door jam/damage via text messages as ordered by Sgt Goldstein, which proves that Plaintiff did not attempt to mislead and/or conceal his action(s) from his supervisor at any time, a fact which was completely and/or intentionally disregarded by Lt. Sanderson and/or Defendant in concluding that Plaintiff had been untruthful.

44. On March 2, 2022, after Lt. Sanderson's investigative findings and recommendations had been reviewed through the appropriate chain of command, Commander Mark Gardner submitted his review of Lt. Sanderson's investigatory findings against Plaintiff to Chief of Police Elaine Bryant.

45. Cmdr. Gardner supported Lt. Sanderson's recommendation that Plaintiff receive "Documented Constructive Counseling" and training for a violation of Charge I, as well as Lt. Sanderson's recommendation to deviate from Defendant's progressive

discipline policy in proceeding with departmental charges against Plaintiff – meaning that discipline up to termination would be considered – for a violation of Charge II.

46.     On March 25, 2022, Defendant relieved the Plaintiff of duty and/or stripped the Plaintiff of his police authority/powers, reassigning him from his patrol duties to mere administrative work, leaving him ineligible for overtime and special duty assignments.

47.     At the time of his reassignment, Plaintiff had not been notified of any departmental charges pending against him and consistently communicated with his union (FOP lodge 9) as to why he was relieved of duty, but Plaintiff's union representatives did not have that information available either.

48.     Plaintiff began exhausting his available leave time balance(s) at the time of his relief of duty by the Defendant, including, but not limited to, his accrued compensatory and vacation time, due to the inherently adverse nature of a Police Officer being in a relieved of duty status and/or the negative effect(s) it had on Plaintiff's mental health.

49.     It was not until April 16, 2022 – three weeks and one day after his reassignment – that Plaintiff received notice of the two departmental charges: Charge I (based upon an alleged violation of CDP Rule of Conduct 1.18, "Arrest, Search, and Seizure" and CDP Patrol Standard Operating Procedure 1.09, "Forms and Reports"), and Charge II (based upon alleged violations of CDP Rule of Conduct 1.15, "General Requirements" and Division Directive 7.02, "Duties and Responsibilities of Personnel").

50.     On April 28, 2022, Plaintiff challenged the Charges against him and presented evidence in his favor in a hearing before Chief Bryant.

51.     Furthermore, on April 28, 2022, at the conclusion of the Chief's hearing and in response to the Plaintiff's written statement to the Chief responding to the charge(s)

alleged against him, Chief Bryant ordered Lt. Sanderson to conduct additional interview(s) with involved witness officer(s) and/or to reinvestigate his own investigation against Plaintiff before she could make her decision as to the appropriate discipline to be issued against Plaintiff, proving that Chief Bryant did not believe that the Defendant's investigation against the Plaintiff, as presented in Chief Bryant's hearing on April 28, 2022, met the required standard to sustain Defendant's allegation(s) against Plaintiff, and/or that Lt. Sanderson's completed investigation at that point in time (April 28, 2022) was neither impartial and/or complete and/or accurate for a determination of appropriate discipline.

52.     Thereafter, on May 26, 2022, Chief Bryant sustained both Charges against Plaintiff and recommended to Defendant's Director of Public Safety, Robert Clark, that Plaintiff be issued a written reprimand for Charge I and receive a 240-hour suspension and termination for Charge II.

53.     On August 11, 2022, Plaintiff appealed Chief Bryant's recommended discipline and termination and presented further evidence in his favor via a hearing before Director Clark.

54.     Furthermore, on August 11, 2022, at the conclusion of the Safety Director's hearing and in response to the Plaintiff's written statement to the Safety Director responding to the charge(s) alleged against him, Director Clark ordered Commander Scott Evers (representing the Defendant and/or CDP) to direct further follow-up interview(s) of relevant witness officer(s) in the investigation against the Plaintiff before he could make a decision as to the appropriate discipline to be issued against the Plaintiff, proving that Director Clark still, in fact, did not believe that the Defendant's completed investigation against the Plaintiff, as presented in Director Clark's hearing on August 11, 2022, met the

required standard to sustain Defendant's allegation(s) against the Plaintiff, and that Lt. Sanderson's completed investigation at that point in time (August 11, 2022) was neither impartial and/or complete and/or accurate for a determination of appropriate discipline, even after the follow up interview(s) and/or investigation ordered by Chief Bryant on April 28, 2022 were allegedly completed by Defendant, and her subsequent finding of "sustained" for both alleged charges and recommendation of a written reprimand for Rule of Conduct 1.18 "Arrest, Search and Seizure" and 240 hour suspension and termination for Rule of Conduct 1.15 "Untruthfulness" against Plaintiff on May 26, 2022.

55.     Ultimately, Director Clark upheld Chief Bryant's recommendation and terminated Plaintiff, effective December 8, 2022.

56.     From the date of Chief Bryant's official swearing in ceremony as the Defendant's police chief for the CDP/certification of her Ohio Peace Officer Training Academy (OPOTA) license on or about April 5, 2022, and in fact, since her appointment and/or selection and/or announcement to the position of Chief of Police for CDP by Defendant's Mayor Andrew Ginther on or about June 2, 2021, Plaintiff neither received nor was issued serious and/or similar and/or progressive and/or comparable prior discipline in relation to the administrative charge(s), specifically Rule of Conduct 1.18 "Arrest, Search and Seizure" and Rule of Conduct 1.15 (A-5) "Untruthfulness", that Defendant sustained against and illegally used as pretext to terminate and/or discipline Plaintiff for, based on his protected class, on December 8, 2022.

57.     Between Plaintiff's relief of duty on March 25, 2022 and his termination effective December 8, 2022, the Defendant continued to allow the Plaintiff to draft, document and publish official police reports from and/or for the citizens of the City of

11

Columbus via phone and to utilize official police and/or law enforcement sensitive databases for related law enforcement tasks while on administrative/desk duty, under the direct and/or general supervision of Sgt. Joshua Daughtry who had commended the Plaintiff numerous times about the quality and/or accuracy and/or thoroughness and/or attention to detail portrayed in his police and/or case reports, although Defendant was allegedly investigating the Plaintiff for untruthful conduct during this timeframe (approximately over 8 months), wholly contradicting the Defendant's asserted reasoning and/or logic and/or motive and/or intent for investigating, charging and terminating the Plaintiff for untruthful conduct in the performance of his official police duties stemming from a legitimate and/or explicit dispatched police call for service, dispatched, in fact, by the Defendant, on December 15, 2021.

58. On October 10, 2023, following an arbitration hearing(s) that were conducted on August 2, 2023 and August 8, 2023, Arbitrator Mitchell Goldberg upheld Director Clark's decision to terminate Plaintiff.

59. Following his termination and the Arbitrator's decision to uphold Defendant's materially adverse actions against him, on April 11, 2024, Plaintiff properly and timely filed a Charge of Discrimination against Defendant with the Ohio Civil Rights Commission ("OCRC") alleging race discrimination, for which he received a Notice of Right to Sue letter on February 13, 2025 (a true and accurate copy of which is attached hereto as Exhibit A to this Complaint).

60. However, despite Defendant's knowledge that several similarly situated Caucasian or otherwise non-Middle Eastern officers committed comparably serious

offenses (including untruthfulness), those officers were not disciplined and/or terminated for such conduct.

61.     Defendant has issued lesser discipline and/or amended disciplinary charges to exclude untruthfulness even where the circumstances warranted such a charge and/or declined to discipline Caucasian or otherwise non-Middle Eastern officers for the same or similar rule violations for which Plaintiff was terminated, even where those officers had similar disciplinary records and/or other relevant similar circumstances.

62.     For example, for the same incident (CDP I.A.B File #: 202203-1024) on December 15, 2021 for which Plaintiff was ultimately terminated, Plaintiff's immediate supervisor Sgt. Jeremy Goldstein, a Caucasian male, reported incorrect information in his incident report and interview; specifically, Sgt. Goldstein stated that he arrived at the scene that day when he, in fact, did not.

63.     However, despite reporting and subsequently repeating a false statement, Defendant did not proceed with departmental charges for untruthfulness against Sgt. Goldstein and, thus, did not terminate him.

64.     Additional examples of Defendant's more favorable treatment for members outside of Plaintiff's protected class, for conduct relating to the alleged violation of Rule of Conduct 1.15 (A-5) "Untruthfulness", include (but are not limited to) the following:

    a.  Patrol Officer Mark Murray (Caucasian, male), who was not terminated
        – and departmental charges for untruthfulness were dismissed – despite
        sustained and/or otherwise adverse findings and/or factual findings by
        Defendant supporting allegations that he made false statements in the
        arrest report of a female suspect and conducted an unlawful search of

her vehicle and/or made false statements in his subsequent internal affairs interview regarding the incident (CDP I.A.B File #: 201604-1035);

b. Patrol Officer Rodney Reed (Caucasian, male), who was not terminated despite sustained and/or otherwise adverse findings and/or factual findings by Defendant supporting allegations that he failed to complete a proper investigation and added false information to a report involving a domestic violence response that he was involved in the day before the same victim was allegedly killed by her abuser; instead, Officer Reed received a written reprimand and eight hour suspension (CDP I.A.B File #: 201909-1017);

c. Patrol Officer Matthew Deerwester (Caucasian, male), who was not terminated despite sustained and/or otherwise adverse findings and/or factual findings by Defendant supporting allegations that he falsely claimed – in contradiction with video evidence – that he shot at a suspect because he believed the suspect was going to assault the secondary officer on scene with his truck; specifically, the Firearms / Police-Involved Death Review Board found that the shooting was "objectively unreasonable" and that the officers' actions were "intentional and in violation of policy." Instead, Defendant required Officer Deerwester to attend training due to the unreasonable shooting and did not terminate him (CDP I.A.B File #: 202103-1054);

d. Patrol Officer Michael Neal (Caucasian, male), who also was involved in the same shooting incident as Officer Deerwester and was not terminated despite sustained and/or otherwise adverse findings and/or factual findings by Defendant supporting allegations that he falsely claimed – in contradiction with video evidence – that he shot at a suspect because he believed the suspect was going to assault him with his truck; specifically, the Firearms / Police-Involved Death Review Board found that the shooting was "objectively unreasonable" and that the officers' actions were "intentional and in violation of policy." Instead, Defendant imposed two 80 hour suspensions upon Officer Neal (to be served concurrently) for a violation of Defendant's use of force and use of firearms policies (CDP I.A.B File #: 202103-1054);

e. Patrol Officer Zackary Rosen (Caucasian, male) who was neither administratively charged with and/or terminated for Rule of Conduct 1.15 "untruthfulness" despite sustained and/or otherwise adverse findings and/or factual findings by Defendant supporting allegations that he falsely claimed – in contradiction with video evidence and witness statements – that he did not kick a restrained Suspect in the head when he responded to assist other officer(s) on a call for service. Instead, Defendant terminated Officer Rosen for a violation of Rule of Conduct 1.19 "Use of Force", despite sustained and/or otherwise adverse findings and/or factual findings by Defendant that supported charging and terminating Officer Rosen for Rule of Conduct 1.15 (A-5)

15

"Untruthfulness", which is considered by CDP and/or Defendant to be a more adverse rule of conduct violation and/or "critical misconduct", compared to a violation of Rule of Conduct 1.19 "Use of Force" (CDP I.A.B File #: 201705-1012).

65.     Furthermore, in relation to conduct involving Rule of Conduct 1.18 "Arrest, Search and Seizure", Defendant issued documented constructive criticism (DCC), which is less adverse discipline than that given to Plaintiff, to at least four separate similarly situated officers to Plaintiff, despite sustained and/or otherwise adverse findings and/or factual findings by Defendant supporting allegations that these officers forced entry into and/or conducted warrantless entries into homes to effect arrest(s) and/or search the premises of without securing a search warrant and/or arrest warrant and/or consent and/or exigent circumstances (hot pursuit), in violation of law and/or the 4th amendment to the Constitution of these United States of America (as Lt. Sanderson asserted of Plaintiff's conduct in his investigation), which is conduct that is, in fact, identical to the Plaintiff's alleged conduct and/or in violation of Rule of Conduct 1.18 "Arrest, Search and Seizure," but unlike these comparators, Plaintiff was issued and/or disciplined more harshly with a written reprimand for his identical conduct regarding Rule of Conduct 1.18, and not a DCC, proving Defendant's more favorable treatment of similarly situated members outside of the Plaintiff's protected class:

a.   Officer N/A, Caucasian, Male, Discipline number: 2022-4703, Incident date: November 7, 2021, Discipline entry date: January 25, 2022;

b.   Officer N/A, Caucasian, Male, Discipline number: 2022-5026, Incident date: August 27, 2022, Discipline entry date: December 2, 2022;

     c. Sergeant N/A, Caucasian, Female, Discipline number: 2023-5191, Incident date: June 10, 2022, Discipline entry date: January 23, 2023;

     d. Officer N/A, Caucasian, Male, Discipline number: 2023-5468, Incident date: June 19, 2023, Discipline entry date: September 6, 2023.

66.    Defendant's more favorable treatment for members outside of Plaintiff's protected class influenced and/or motivated Defendant's discriminatory application of the Contractual Bargaining Agreement (CBA) between FOP Lodge 9 (whom Plaintiff was and/or is a member of) and the Defendant and/or City of Columbus, regarding Defendant's investigation of the Plaintiff under section "8.5 Investigation Questioning" of the CBA, specifically, Defendant did not produce in writing and/or furnish in writing and/or submit in writing and/or satisfy the provision that states "the summary of the allegations and any known basic facts shall be in writing", as required by section 8.5 of the CBA, in order to properly notify and/or apprise Plaintiff as to the nature and/or facts of the administrative charge(s) against him prior to the interview so that the Plaintiff can prepare for the interview, like Defendant produced in writing and/or furnished in writing and/or submitted in writing and/or satisfied section 8.5 of the CBA for similarly situated members outside of the Plaintiff's protected class, in the following way(s):

     a. Defendant typed and/or stated and/or published, in the "Notification of Internal Investigation, Rights, and Administrative Order to Submit to Interview" form that was produced for the Plaintiff in Lt. Sanderson's email to the Plaintiff on January 25, 2022, and again produced by Defendant and/or Lt. Sanderson for the plaintiff in the interview room at CDP substation 9 on January 27, 2022 in the immediacy before the

interview, under the heading "The Columbus Division of Police is conducting an administrative investigation. The following are the basic known facts:" – to which Lt. Sanderson typed and/or stated and/or published the following for the Plaintiff to read and/or acknowledge: "I am investigating misconduct that occurred on December 15, 2021 at 3:51 PM. The location of the misconduct is 1890 South 4th Street, Incident #210946311. The misconduct involves the forced entry that you performed on the door of 1890 South 4th Street", a blanket statement that kept the alleged "misconduct" vague and/or speculative, explicitly only mentioning that the misconduct that is being investigated is "the forced entry that you performed on the door of 1890 South 4th street," and/or relating to Rule of Conduct 1.18 "Arrest, Search and Seizure" (a violation which is not considered "critical misconduct") with no typed and/or stated and/or published facts of any misconduct and/or investigation relating to Rule of Conduct 1.15 (A-5) "Untruthfulness", although Lt. Sanderson and/or Defendant were, on or about January 27, 2022 and/or as early as December 19, 2021 (4 days after the call for service), in fact, investigating the Plaintiff for alleged misconduct and/or alleged potential misconduct relating to Rule of Conduct 1.15 (A-5) and/or untruthfulness, which was, in fact, the basis and/or intent for the interview that Defendant imposed onto the Plaintiff on January 27, 2022 (see memo/email from Lt. Sanderson to Chief Bryant, Subject:

"Out of Policy Forced Entry – Possible Critical Misconduct", dated: January 18, 2022)

b. Defendant properly apprised Officer Murray of the nature and/or basis of the interview and/or investigation imposed onto him and/or was articulately advised of the nature of the investigation and/or misconduct alleged against him by the Defendant, and specifically alluded to the rule of conduct the Defendant was investigating him for, by typing and/or stating and/or publishing in the "Notification of Internal Investigation, Rights, and Administrative Order to Submit to Interview" form, under the heading "The Columbus Division of Police is conducting an administrative investigation. The following are the basic known facts:" the following statement(s) – "Ms. Amanda Ritterbeck *alleges Officer Mark Murray made false statements in the arrest paperwork*, did not have consent to search the vehicle she was in and refused to stop searching once he was advised to stop", a statement containing undeniable fact(s) which clearly and/or directly apprised Officer Murray of the identical and/or nearly identical rule of conduct that Defendant was interviewing and/or investigating him for, which in this case was Rule of Conduct 1.15 (A-5) "Untruthfulness", allowing Officer Murray to prepare for the interview (see CDP I.A.B File #: 201604-1035);

c. Defendant properly apprised Officer Rosen of the nature and/or basis of the interview and/or investigation imposed onto him and/or was

articulately advised of the nature of the investigation and/or misconduct alleged against him by the Defendant, and specifically alluded to the rule of conduct the Defendant was investigating him for, by typing and/or stating and/or publishing in the "Notification of Internal Investigation, Rights, and Administrative Order to Submit to Interview" form, under the heading "The Columbus Division of Police is conducting an administrative investigation. The following are the basic known facts:" the following statement(s) – "You responded to a dispatched call for service involving a person with a gun. Officer Stephens #2829, 2C3 arrived on scene. Officer Stephens used force during his contact with and arrest Mr. Demarko Anderson. Officer Rosen #2677 arrived on scene. *Officer Rosen used a level 4 use of force on Mr. Anderson"*, a statement containing undeniable fact(s) which clearly and/or directly apprised Officer Rosen of the identical and/or nearly identical rule of conduct that Defendant was interviewing and/or investigating him for, which in this case was Rule of Conduct 1.19 "Use of Force", allowing Officer Rosen to prepare for the interview (see CDP I.A.B File #: 201705-1012).

67.     As a direct and proximate result of Defendant's discriminatory termination of Plaintiff based on his race, Plaintiff suffered, and continues to suffer, economic loss in the form of lost income, despite reasonable but unsuccessful efforts to secure comparable employment.

68.     As a direct and proximate result of Defendant's discriminatory termination of Plaintiff based on his race, Plaintiff suffered, and continues to suffer, from emotional distress, frustration, humiliation, financial debt, withdrawal of relationship(s) with peers and/or family, and the general loss of enjoyment of life and well-being.

69.     As a direct and proximate result of Defendant's discriminatory termination of Plaintiff based on his race, Defendant acted with conscious disregard toward Plaintiff's right to remain free from discrimination, even though Defendant's conduct had a great probability of causing Plaintiff economic and emotional hardship (and, in fact, caused such harm).

70.     To date, despite exercising reasonable diligence in pursuing employment comparable his position with Defendant, Plaintiff has been unable to secure a reasonable replacement position that compares with the compensation, overtime and special duty opportunities, and other fringe benefits afforded to him by virtue of his employment with Defendant.

**Causes of Action**

A.     **Count I: Violation of the Reconstruction Era Civil Rights Act, 42 U.S.C. § 1981**

71.     Paragraphs 1 through 70 are realleged and incorporated herein.

72.     Defendant, acting under color of state law, subjected Plaintiff to intentional racial discrimination in the making and enforcement of his employment contract in violation of 42 U.S.C. § 1981.

73.     By terminating Plaintiff because of his race, while retaining similarly situated employees outside of his protected class despite their engagement in the same,

21

similar, or worse conduct than Plaintiff's alleged conduct that Defendant claimed as a pretextual reason for his termination, Defendant violated 42 U.S.C. § 1981.

**B.** **Count II: Violation of the Ohio Laws Against Discrimination, R.C. 4112**

74.    Paragraphs 1 through 70 are realleged and incorporated herein.

75.    Defendant engaged in unlawful employment practices by discriminating against Plaintiff based on his race in violation of R.C. § 4112.02(A).

76.    By terminating and/or subjecting Plaintiff to more adverse discipline because of his race, while retaining similarly situated employees outside of his protected class despite their engagement in the same, similar, or worse conduct than Plaintiff's alleged conduct that Defendant claimed as a pretextual reason for his termination, Defendant violated the Ohio Laws Against Discrimination, R.C. 4112.99.


**Prayer for Relief**

WHEREFORE, Plaintiff is entitled to and prays for the following relief:

A.    a declaration that Defendant violated 42 U.S.C. § 1981 and/or the Ohio Laws Against Discrimination;

B.    equitable relief of reinstatement to his prior position, with no period of probation and/or be subjected to any adverse conditions, with all applicable seniority and other benefits restored, and make him otherwise whole;

C.    immediate removal of his name from the Franklin County Prosecutor Office's Brady List and the Columbus Division of Police untruthful officer list, caused by his illegal and unlawful termination;

D.      the revocation, nullification and removal of the racially discriminatory investigation against him, that led to his illegal and unlawful termination, from his work history file;

E.      wages, salary, employment benefits, and other compensation denied or lost, at the current contractual hourly payrate between FOP Lodge 9 and the City of Columbus for his level of accrued seniority, including special duty wages lost beginning on March 25, 2022 until the date of his reinstatement due to Defendant's imposed reassignment of Plaintiff on March 25, 2022 and his inability to work his regularly scheduled special duty job(s) up until the date of his illegal and unlawful termination on December 8, 2022, in an amount exceeding $75,000, because of Defendant's violations;

F.      compensatory damages in an amount exceeding $25,000;

G.      prejudgment and post-judgment interest:

H.      reasonable attorneys' fees and costs; and

I.      such other relief as the Court deems fair and equitable.

Respectfully submitted,

By: /s/ Helal Daoud
Helal Daoud, pro se

790 Brooks Way, Columbus, Ohio 43212
937-546-4177
h-daoud@hotmail.com

## **JURY DEMAND**

Plaintiff demands a trial by jury on all issues and defenses triable to a jury.

By: */s/ Helal Daoud*
Helal Daoud, *pro se*

<u>Ex. A</u>

# OHIO CIVIL RIGHTS COMMISSION

**Board of Commissioners:**
Valerie A. Lemmie – Chair
Lori Barreras
William W. Patmon, III
Vernon Sykes
Charlie Winburn



Angela Phelps-White,
Executive Director

| | | |
|---|---|---|
| **Charging Party,** | ) | |
| | ) | |
| Helal Daoud | ) | |
| | ) | |
| **v.** | ) | **Charge No.** TOL71(006395)04162024 |
| | ) | 22A-2024-02954 |
| **Respondent,** | ) | |
| | ) | |
| City of Columbus, Ohio, Division of Police | ) | |
| | ) | |

---

## NOTICE OF RIGHT TO SUE

---

Pursuant to Ohio Revised Code 4112.051, you may file a civil action against the Respondent(s) alleging a violation of Ohio Revised Code 4112. The lawsuit may be filed in any State of Ohio court that has jurisdiction over the matter. Ohio Revised Code 4112.052 and 4112.14 provides that such a civil action must be filed within two years after the date of the alleged discriminatory practice. The time period to file a civil action is tolled during the pendency of the Commission investigation. You are advised to consult with an attorney to determine with accuracy the date by which a civil action must be filed. FOR FEDERAL COURT FILINGS: Notices of Right to Sue under federal law will be issued by the EEOC.

**FOR THE COMMISSION**

*Stacy A. Latta*

Stacy A. Latta
Toledo Regional Director
Stacy.Latta@civ.ohio.gov

Date mailed: February 7, 2025